THE PEOPLE OF THE STATE OF CALIFORNIA *ex rel.* J. G. McCULLOUGH, Attorney–General, *v.* ROMUALDO PACHECO, Treasurer of said State, and THE CENTRAL PACIFIC RAILROAD COMPANY OF CALIFORNIA.

Power of the Legislature over Taxation and Appropriations. — By the Constitution of California, the legislative department of the Government is vested with the power of taxation, and the authority to determine the objects for which the taxing power shall be exercised, and to appropriate the moneys thus raised to such objects; and there is no restriction upon this power as to the objects to which, or the time for which appropriations may be made, except that "no appropriations for a standing army shall be for a longer time than two years."

Appropriations—When do not create State Debt.—There being no limitation in the Constitution in respect to the time over which legislative appropriations may extend, a law which appropriates a sum or sums of money for the future, and directs certain payments to be made out of the same at designated periods, from year to year thereafter, and which also imposes a special tax and sets apart the proceeds thereof to constitute a fund sufficient to meet the sums so appropriated and directed to be paid, as the same become payable, does not create a debt within the meaning of the prohibitory clause in Article VIII of the Constitution of the State of California.

Creation of State Debt in Case of War. — The legislative department of the State Government has the exclusive right to determine when such a state of war exists as will authorize it to create a debt to repel invasion or suppress insurrection, without submitting the law creating the debt to the people; and its determination upon this subject is not subject to review, or liable to be controlled by the judicial department.

Legislative Determination when War exists.—The passage by the Legislature of an Act creating a debt for the purpose of repelling invasion or suppressing a rebellion, without a submission of the question to a vote of the people, which Act recites in its preamble the existence of war, and refers in the body of the Act to such recital for the reasons which operated upon that body to induce the passage of the Act, is evidence of a determination by the Legislature that the exigency justifying its action in creating the debt has arisen.

Aid to a Railroad Corporation by the State.—Section ten of Article XI of the

Constitution, prohibiting the State from giving or loaning its credit to or in aid of a corporation, does not prohibit the State from appropriating its funds, in time of war, to aid a corporation in the construction of a railroad to be used by the State for military purposes.

GIFT OR LOAN OF THE CREDIT OF THE STATE TO A CORPORATION.—The imposition of a special tax, and an appropriation of the proceeds of the same to be paid, when collected, to a railroad company, or its creditors, to aid in building the railroad, in consideration of valuable services to be rendered thereafter to the State by the corporation, is not a gift or loan of the credit of the State to or in aid of a corporation, within the meaning of section ten of Article XI of the Constitution.

FINAL JUDGMENT ON BILL TO OBTAIN INJUNCTION.—Where a bill is filed by the people on the relation of the Attorney-General to enjoin the State Treasurer from paying money out of the Treasury, on the ground of the unconstitutionality of the Act directing the Treasurer to make the payment, and the Court on the final trial deny the injunction, the judgment denying the injunction should not contain a clause adjudging and decreeing that the Treasurer pay over the money as required by the law.

APPEAL from the District Court, Sixth Judicial District, Sacramento County.

The following are copies of the complaint, answers, judgment, and stipulation in this cause :

The People of the State of California, on the relation of John G. McCullough, Attorney-General of said State, complain of the defendants, Romualdo Pacheco, Treasurer of said State, and the Central Pacific Railroad Company of California, a corporation duly incorporated under the laws of and doing business within said State, and for cause of complaint aver and show and cause this Court to be informed, that the said railroad company, defendant, assuming to act under a pretended statute of the Legislature of said State, approved April 4th, 1864, and entitled "An Act to aid the construction of the Central Pacific Railroad, and to secure the use of the same to this State for military and other purposes, and other matters relating thereto," have executed and issued, or are about to issue, fifteen hundred bonds, numbering from one to fifteen hundred inclusive, for the sum of one thousand dollars each, with forty interest coupons, each for thirty-five dollars, attached to each of said bonds, and that the following is the form and copy of one of said bonds, viz :

"UNITED STATES OF AMERICA.

"No. —.

" The Central Pacific Railroad Company of California acknowledge themselves to owe to Oakes Ames, of North Easton, in the State of Massachusetts, or to the holder hereof, the sum of one thousand dollars, which sum they promise to pay to the holder hereof, in the City of New York, on the 1st day of July, 1884, with interest thereon at the rate of seven per cent per annum from the first day of July, 1864, payable semi-annually, on the first day of January, 1865, and on the first days of July and January of each year thereafter, at the State Treasury of the State of California, in the City of Sacramento, in said State, upon the surrender of the annexed coupons to the Treasurer of said State, both principle and interest payable in *United States gold coin*, at par dollar for dollar—this bond being one of fifteen hundred, numbering from one to fifteen hundred inclusive, of the same tenor, amount, and date, issued under and in pursuance of an Act entitled 'An Act to aid the construction of the Central Pacific Railroad, and to secure the use of the same to this State for military and other purposes, and other matters relating thereto,' approved April 4th, 1864, and by the provisions of said Act, the interest thereon is to be paid by the State of California. The payment of the principal and interest of this and said other bonds is also secured by a mortgage executed by the said company upon the whole of their railroad from the City of Sacramento to the eastern boundary line of the State of California, and all the rolling stock, fixtures, and franchises thereof, to Edgar Mills, of Sacramento, State of California, and Joseph A. Donohoe, San Francisco, State of California, as trustees for the holders of such bonds and coupons. The payment of said bonds is also secured by a sinking fund, provided by setting apart in the year 1870, and each year thereafter, from the net earnings and income of the railroad of said company, the sum of fifty thousand dollars in trust, to be loaned out on interest, which sums, with the accumulating interest thereon, are irrevocably pledged to the holders of said

23

bonds for the final payment and redemption thereof. And it is hereby stipulated and conditioned that the City and County of San Francisco, and the Counties of Sacramento and Placer, in the State of California, shall not be liable for any of the debts or liabilities of said company to an amount beyond or exceeding the amount of the capital stock of said company subscribed, or which may hereafter be subscribed by them, or either of them, upon the books of said company.

" In testimony whereof, the said company have caused their corporate seal to be hereunto affixed, and the same to be signed by their President and Secretary, this first day of July, 1864.

                         " L. STANFORD, President.

[SEAL.]    " E. H. MILLER, Jr., Secretary."

And said plaintiffs further complain, and cause this Court to be informed, that said defendant Pacheco, assuming to act solely by virtue of the provisions of said pretended statute, and pretending to act in his official capacity as Treasurer of said State, and to bind the people thereof, has signed or is about to sign each of said forty interest coupons attached to each of said fifteen hundred bonds, and that the form of one of said coupons attached as aforesaid, being the coupon first falling due thereon, and the other thirty-nine coupons being of like tenor, except that they fall due in regular order every six months after the first day of January, A. D. 1865, and also that the form of the indorsement on the back of said coupons signed by said Pacheco as said Treasurer, is as follows, viz :

" $35.            Central Pacific R. R. Co. of California.
" Coupon No. 1.

" For thirty-five dollars in U. S. gold coin, due January 1, 1865, payable by the State of California, at the State Treasury.
. " For Bond No. —. ·

                     " E. H. MILLER, Jr., Secretary.

" This coupon is payable by the State of California, under an Act entitled 'An Act to aid the construction of the Central Pacific Railroad, and to secure the use of the same to this

State for military and other purposes, and other matters relating thereto,' approved April 4th, 1864.

" R. PACHECO, State Treasurer."

And the Attorney-General, further informing on behalf of the People aforesaid, avers that it is the intention of said railroad company, defendant, still assuming to act under the provisions of said pretended statute, and they so declare it openly to be their intention to demand of and from the defendant Pacheco, as Treasurer aforesaid, the payment in pursuance of the tenor thereof, of the said fifteen hundred coupons attached to said bonds which fall due on the said first day of January, 1865, amounting in all to fifty-two thousand five hundred dollars, in the gold coin of the United States, and to demand of said Treasurer and his successors in office the payment of the said other coupons attached to said fifteen hundred bonds as they severally fall due, amounting in all, together with said first coupons, to the sum of two million one hundred thousand dollars, in said gold coin.

And further informing on behalf of the People aforesaid, the Attorney-General avers, that defendant Pacheco, pretending to act in his capacity as Treasurer as aforesaid, threatens and declares it to be his intention to pay out of the State Treasury, in said United States gold coin, on the 1st day of January, 1865, the said amount claimed by said railroad company as aforesaid, to be then due as interest on said fifteen hundred bonds, and also in like manner while he remains in office, he declares it to be his intention to pay said other coupons out of the State Treasury as they severally fall due as aforesaid, claiming and pretending to make such payments, and that the same are authorized, and the said company defendant, claiming and pretending to receive said moneys, under the provisions of said pretended Act of the Legislature.

And the Attorney-General, in behalf of the People aforesaid, avers and charges, that said Pacheco, as such State Treasurer, will carry out his threats and continue to sign said coupons, and will pay said coupons out of the moneys in the State

Treasury now under his control as such Treasurer, and the said company defendant will receive said payments from said moneys, unless they and each of them are restrained and enjoined from so doing by the order and injunction of this Court.

And the said Attorney-General further informs the Court that he is advised and so charges the fact to be, that the said pretended Act of the Legislature (by virtue of which solely said defendants are now assuming and claiming to act and intend further to act under its provisions,) is wholly unconstitutional and void, and utterly and entirely inoperative and of no valid force so as to authorize or empower said defendant company to execute and issue said fifteen hundred bonds with the coupons attached in the form aforesaid, or to authorize or empower them or any other parties to receive payment of said coupons or any part thereof out of any moneys now or that may hereafter be in the State Treasury, and that said pretended Act confers no valid power or right to exercise the duties or authority in the same attempted to be created and delegated to the said defendants as aforesaid by reason of this :

That notwithstanding long before, and at the time, and ever since the passage of said pretended Act, the State of California was and is indebted in a sum greatly exceeding the sum of three hundred thousand dollars upon debts and liabilities created by the Legislature thereof, no sufficient ways or means, exclusive of loans, were provided by said Act for the payment of the debt and liabilities therein attempted to be created as the same falls due and for the full discharge thereof within the next twenty years.

And for this: That though the public debt of the State before, at the time, and ever since April 4th, 1864, over and exclusive of the amount sought to be appropriated by said pretended Act, was far exceeding three hundred thousand dollars, yet the said pretended Act did not provide for its submission to the people of the State, nor has the same in fact been submitted nor attempted nor pretended to be submitted to said people, nor has said pretended Act ever received at any general elec-

tion a majority of all the votes cast for or against it by the people at such general election.

And for this : That though upon April 4th, 1864, and since the indebtedness of the State as aforesaid exceeded three hundred thousand dollars, yet said pretended Act was not passed, nor the liability upon the State therein contemplated was not nor is attempted to be contracted during a time or in the case of war to repel invasion or suppress insurrection—that in fact neither then nor since, were or have the people of this State been engaged in any war for repelling any invasion or suppressing any insurrection against its authority.

And for this : That said pretended Act attempts to give and to loan the credit of this State in some manner to and in aid of said Central Pacific Railroad Company of California, a corporation duly organized under the laws of said State.

Wherefore, the said Attorney-General avers, that all the acts already performed by said Pacheco, Treasurer as aforesaid, in behalf of the people and intended to be hereafter performed by the defendants under the said provisions of said pretended Act, were and are and will be wrongful and illegal, and utterly in violation of law, and all liabilities and payments contracted and made, or to be contracted and made, and all moneys paid or to be paid out by said Pacheco, or received or to be received by said company defendant, or any holder of said coupons, under the said provisions of said pretended Act, are and will be illegal, wrongful, and fraudulent against the people of the State of California.

And the Attorney-General further informing, gives the Court to know, that if the defendant Pacheco is permitted to continue to sign and issue said coupons or pay out of the State Treasury said moneys, and the defendant company to negotiate said coupons or to receive said moneys, the said people must suffer great, serious, and irreparable injury and loss thereby.

Wherefore, inasmuch as the said people have no speedy, adequate, nor complete remedy by the course of the common law for the injuries committed and threatened to be committed by the said defendants and others hereinbefore set forth, they

pray this Court by the final judgment thereof, and in the meantime until the rendition of such final judgment, that said R. Pacheco, Treasurer of said State of California, and the said Central Pacific Railroad Company of California, their and each of their counsel, solicitors, agents, attorneys, and employés, may be restrained by the order and writ of injunction of this Court from doing any act or acts under the said provisions of said pretended statute, and especially that said defendant company be restrained from executing and issuing the said fifteen hundred bonds with the coupons attached in the form above recited (and if already executed, that the same may be cancelled, and the defendant company restrained from proceeding any further in the issuance or negotiation thereof,) and that said defendant Pacheco be restrained from signing said coupons (and if any or all are already signed, that the same may be cancelled and he be restrained from delivering them to said company or to any other,) and especially that said Pacheco be perpetually restrained and enjoined from paying out any of the moneys of the State Treasury under his control, in liquidation of said coupons to said company or to any other, under the provisions of said pretended Act of the Legislature, and that said company be forever restrained and enjoined from collecting or receiving any of said moneys on said coupons or otherwise—and be forever restrained from enforcing or attempting to enforce the payment of said coupons, or any of them, or any part thereof, from the State Treasury, or any moneys therein—and that such other orders and decrees, interlocutory and final, may be made herein, as to equity may pertain, and that such other relief as is proper may be granted.

JOHN G. MCCULLOUGH,
Attorney-General.

The said defendants, the Central Pacific Railroad Company of California, a corporation duly organized under the laws of the State of California, for answer to the complaint filed in said action, deny that the said statute described and referred to in said complaint is unconstitutional or void, but on the

contrary they aver that the same is a valid statute, and does
not violate any provision of the Constitution of the State of
California, or of the United States, and the said statute fully
authorizes the execution and issue of the said bonds and cou-
pons described in said complaint, and also authorizes and
requires the payment of said coupons by the Treasurer of said
State of California, out of the moneys in the State Treasury, and
in his hands as such State Treasurer; that it was not necessary,
nor does the Constitution of the State of California require,
that said statute should be submitted to the people of said
State at any election held in said State; and they further aver
that said statute was passed in a time of war, to repel inva-
sion, and suppress insurrection, as set forth in said Act and
the preamble thereof; that at that time, and ever since, the
United States were and have been engaged in a war with cer-
tain persons who have rebelled against the authority of the
Government of the United States, of which the State of Cali-
fornia forms a part, and the National Government was at said
time and ever since has been engaged in suppressing a gigan-
tic insurrection of a portion of the people of the United States
against its authority, and the said Act was passed by the State
of California " to repel invasion, suppress insurrection, and
defend the State against its enemies," and the Legislature of
said State had full power and authority to enact said law, and
it is the duty of the officers of said State to enforce the same,
and give full effect to all its provisions.

The said defendants further say, that they have fully and
faithfully complied, in all respects, with the provisions, require-
ments, and conditions of the said Act, on their part therein
provided to be performed; that within ninety days after the
passage of said Act, to wit: on the 4th day of May, 1864, the
said defendants duly filed in the office of the Secretary of State,
a contract and agreement, duly signed by the President and
Secretary of said company, and sealed with the corporate seal
thereof, therein and thereby agreeing to faithfully do and per-
form, and fully comply, on the part of said company, with all
the terms and conditions set forth in said Act, and the fourth

section thereof, and therein also releasing all claim to the warrants provided to be issued by the Act entitled an Act to aid the construction of the Central Pacific Railroad in the State of California, and other matters relating thereto, approved April 25, 1863, and also agreeing therein that said company should, within ninety days after the receipt of a patent therefor from the United States, execute, acknowledge, and deliver to the State of California, a deed in fee simple for the conveyance of the south half of section nineteen, in Township Eleven north, of Range Seven east, Mount Diablo meridian, situated in Placer County, on said railroad, and about twenty-two miles from Sacramento, with all the granite and granite quarries thereon, excepting and reserving therefrom, however, a tract or strip of land four hundred feet wide, and running across said half section, each one half thereof lying on each side of the line running along the centre of the main railroad track of said company, and the said company has never received a patent for said tract of land.

And the said Central Pacific Railroad Company of California further aver, that the passage of said Act by the Legislature of said State, and the acceptance of the terms, conditions, and provisions thereof by these defendants, by filing said contract and agreement in the office of the Secretary of State, as provided by said Act, constituted and made a valid, legal, and binding contract between the State of California and these defendants, and the payment of said interest coupons of the said fifteen hundred bonds, described in said complaint, by the State Treasurer, out of moneys in the State Treasury, is and will be but the payment and discharge of a just, valid, and binding liability of the State of California, arising under a valid, subsisting obligation and contract, on the part of said State, as a just, proper, and agreed compensation for the services and transportation of property done and performed, and agreed to be hereafter done and performed, by these defendants, for the use and benefit of said State of California.

Wherefore, these defendants have good right to demand and receive the payment of said interest coupons on the said fifteen

hundred bonds described in said complaint, from time to time, as the same shall fall due, to be paid by the said Pacheco as such State Treasurer, and his successors in said office, out of moneys in the State Treasury, and the said State Treasurer, and his successors in said office, has full power and authority, and it is his and their duty to pay the same, as they shall from time to time become due, under and in accordance with the provisions of the said statute.

Wherefore, these defendants pray judgment that the said defendant, R. Pacheco, as such State Treasurer, and his successors in said office, be ordered and directed to pay to the holders thereof, the said forty interest coupons attached to each of the said fifteen hundred bonds described in said complaint, as the same shall respectively fall due, out of moneys in the State Treasury, as provided in the said statute described and referred to in said complaint, and for their costs herein expended, and for such other and further relief as may be just and proper.

E. B. CROCKER,
Attorney for Central Pacific R. R. Co. of Cal.

The said defendant, Pacheco, for answer to the complaint filed in said action, denies generally and specifically each and all the allegations in said complaint, except that he admits that he is State Treasurer, and that, as he is informed and believes, the said Act of the State of California described and referred to in said complaint, is a valid and binding statute, and the same authorizes and requires this defendant, as such State Treasurer, to pay the said coupons attached to said bonds described in said complaint.

Wherefore, he prays for judgment, etc.

E. B. CROCKER,
Attorney for Pacheco.

October Term, A. D. 1864.   Judgment, November 25th, 1864.

This cause having been duly submitted to the Court for trial,

upon the pleadings and stipulation filed, the Court now finds for said defendants, and that said Central Pacific Railroad Company is entitled to a judgment as prayed for in their answer.

It is therefore ordered, adjudged and decreed, that the injunction against said defendants prayed for in the complaint filed in said action be and the same is hereby denied.

And it is further ordered, adjudged, and decreed, that the said Romualdo Pacheco, State Treasurer of the State of California, and his successors in said office, be, and they are hereby ordered and directed to pay to the holders thereof, the said forty interest coupons attached to each of the said fifteen hundred bonds described in said complaint, and numbering from one to fifteen hundred, inclusive, said interest coupons being for thirty-five dollars each, payable in United States gold coin, the same to be paid from time to time as the said interest coupons shall respectively fall due, out of the State Treasury, and the moneys and funds therein, in accordance with the provisions of the Act entitled "An Act to aid the construction of the Central Pacific Railroad, and to secure the use of the same to this State for military and other purposes, and other matters relating thereto," approved April 4, 1864.

It is hereby stipulated and agreed by and between the above named plaintiffs and defendants, that this case shall be heard and determined in the Supreme Court upon the pleadings, the judgment and this stipulation, and it is further agreed and admitted, that the facts stated in said complaint and not denied in the answer of the Central Pacific Railroad Company of California, are true ; and further, it is admitted that the averment of facts in said answer of the said company are also true, except that it is not admitted as a matter of fact, that, at the time of the passage of the Act of April 4, 1864, mentioned in said pleadings, or since, the said State (though it is that the

General Government) was engaged in any war, or repelling any invasion, or suppressing any insurrection.

(Signed,)                    J. G. McCULLOUGH,
            Att'y-Gen'l and for Plaintiffs and Appel'ts.
(Signed,)                    E. B. CROCKER,
            Attorney for Defendants and Respondents.

The other facts are stated in the opinion of the Court.

*J. G. McCullough, Attorney-General,* for Appellant.

The Act in question violates Article VIII of the State Constitution. The Legislature have attempted to create an unconstitutional debt.

It is admitted that the Act was never submitted, nor is there any provision in the Act itself for its submission, to a vote of the people. It is admitted that the debt of the State, upon April 4th, 1864, and ever since, has and does greatly exceed three hundred thousand dollars.

We maintain, first, that the law attempts to create a debt; and, second, that it does not come within the exception of the Article. And preliminarily we remark that the doctrine that this Article is merely directory or advisory, and addressed solely to the legislative conscience, and not mandatory upon the Legislature, has long since been abandoned. (*People* v. *Johnson,* 6 Cal. 504; *Nougues* v. *Douglass,* 7 Cal. 68, 76.)

First—The Act assumes to authorize the creation of a State debt or liability.

The VIIIth Article of the Constitution is plain, and clear to the obscurest understanding. The terms are general and comprehensive. The Legislature is forbidden to create " any debt." A debt may be contingent or absolute, created by statute expressly or by contract, by appropriation when there is no money to meet it, (at least within the current fiscal year,) by drawing against a fund when none such exists, and in various other ways. But lest a narrow construction should be placed upon the word " debt," and an attempt made to except from its meaning some kind of a State obligation, the

Legislature is forbidden to create " any liability," direct or indirect, present or future, express or implied. And that there might be no possible evasion, the Legislature is forbidden to create any debt or debts, liability or liabilities, "*in any manner.*"

But it is said that this Article was not intended to include the necessary and ordinary expenses of the Government. Such a construction is negatived by the debates in the Constitutional Convention, by the very words of the Article, by the exception in cases of war, and by the sixteenth section of Article XII. The debates in the Convention show (and surely the framers should know what they meant) that the Article was intended to cover governmental expenses. It was the very subject discussed, some contending for one hundred thousand dollars, some for five hundred thousand dollars, and finally the Convention settled on three hundred thousand dollars as the full limit the Legislature was permitted to go in the creation of a State debt, unless the same was submitted to a vote of the people. The three hundred thousand dollars was intended as a margin, after the State Government was fairly put in operation under the sixteenth section of Article XII, to meet any deficit occasioned by the miscalculations of subsequent Legislatures in framing their tax and appropriation bills, in the failure of the usual sources of revenue, etc. (Debates in the Convention, p. 165 ; *People* v. *Johnson,* 6 Cal. 501 ; *State* v. *Medbery,* 7 Ohio, 532.) Nor do the words of the Article warrant any such exception; and nothing but a forced and strained reading can draw such a construction from the terms.

But the exception in cases of war, invasion, and insurrection, shows also that the framers thought that unless the exception was made the words would include such expenses; and if one exception be expressly made, why not make others, if such were intended? " If the general limit would not include these ordinary expenses of the State, why should the same general rule include the more pressing demand in time of war?" (*Nougues* v. *Douglass,* 7 Cal. 67.)

And again, Article XII, section 16, answers this objection.

The Convention, acknowledging the force of such an objection when applied to the first Legislature, which was to put the Government in operation, which would be without any means in the Treasury to defray the expenses, and before any revenue could be collected, which must therefore borrow to obtain the means; and, judging that the power to borrow only three hundred thousand dollars might not be ample enough to meet all the governmental expenses, expressly provided that the limitation contained in the VIIIth Article should not extend to that Legislature, but it was authorized to "negotiate for such amount as might be necessary to pay the expenses of the State Government."

We urge, then, that this Article is not simply a limitation upon the power to borrow money, but that it includes liabilities of every nature which may be "in any manner" created by the Legislature; and that the powers of taxation and appropriation are incidents to the power of creating a debt or liability.

But grant that this construction is too broad, (for it is not necessary in its full scope to sustain our case,) we particularly present another view. The Constitution establishes a State Government; machinery is provided for its organization; its powers are divided into three separate departments; these departments are to be filled with officers to exercise the powers and functions appertaining to them; salaries are provided to be paid to them; executive, judicial, and legislative officers are to receive compensation; (Art. V, Sec. 21; Art. VI, Sec. 15; Art. XII, Sec. 15, of the Const.;) other strictly governmental expenses are provided to be incurred.

The VIIIth Article prohibits the *Legislature* from creating any debt or liability. But the foregoing liabilities are created by the *Constitution*, not by the Legislature. They are created by the very instrument that creates the VIIIth Article itself.

These provisions must stand and be construed together. Each must have its effect. The Convention that framed, the people who adopted the VIIIth Article, framed and adopted the Vth, VIth, and XIIth Articles. The "debt or liability"

inhibited by that Convention and the people, to be created against the State by only *one* of the departments of the proposed government was created by the Convention and the people themselves, at the same time, and by the same act, for the purpose of the successful organization and subsequent operation of *all* the departments of that proposed Government. In other words, the debts or liabilities inhibited in the VIIIth Article must have their sources not within, but outside of and beyond, the Constitution. With the former that Article has nothing to do. To use the words in a peculiar sense, it forbids the creation of *legislative*, but not *constitutional* debts.

But, though it be true that the Constitution creates liabilities of a character above enumerated, it nowhere provides that the State shall go into a system of internal improvements, or launch out into any scheme of financial speculation. (*State* v. *Medbery*, 7 Ohio, 536.)

And if it be said, as it was in *The State of California* v. *McCauley*, 15 Cal. 455, that any or all of the considerations mentioned in section four of the Act in question, viz : the transportation of convicts to the State Prison, of lunatics to the Insane Asylum, the conveyance of public messengers, of articles to the fairs of the State Agricultural Society, of materials for the construction of the State Capitol Building, of troops and munitions of war belonging to the State, etc., etc., are to be as much provided for, and it is as much the duty of the State to see to that provision as it is to provide for the salaries of her officers ; and that the obligation of the State to pay the expenses of such conveyance and transportation exists with equal force and to the same extent, without as with the Act and so-called contract thereunder—it is answered : That a subsisting contract entered into by the State to pay for such conveyance and transportation, creating a present liability to pay specific sums of money semi-annually for the next twenty years, and a mere abstract constitutional obligation to perform said acts, and to pay the expenses of such conveyance and transportation, are obviously two different things ; the one creates a direct liability for a specific sum of money

to individuals; the other is a simple enunciation of one of the duties of a Legislature; the one creates a debt, the other is merely the announcement of a moral obligation addressed to the legislative conscience. (*State* v. *Medbery*, 7 Ohio, 537.)

It is argued that the Act is a contract between the State and the company, by which the former, in consideration of certain things performed and to be performed by the latter, agrees to pay the interest on these bonds for the next twenty years.

Because the Act may have the effect of a contract, does it any the less assume to create a debt? If A. contracts with B. to perform certain services, does or may not that contract create a debt against A. ? The Legislature, not being prohibited, has the power to make contracts, and we will assume contracts of this character, but it must make them in compliance with and in subordination to the provisions of the Constitution. The power to contract is an incident to, if not inherent in, the power to create a debt or liability. Can there be any creation of a debt except by words of contract? If the power to do the former is limited, must not the power to do the latter necessarily be? And if a contract be entered into by which an individual advances money or services, or promises to advance either to the State, and the latter in return promises to advance money in satisfaction, is the consideration of the State any the less an inhibited liability under the VIIIth Article because of the different nature of the consideration advanced by the individual? There is no magic in the word "contract." The State being free from debt, the Legislature may, by contract, borrow *from* an individual three hundred thousand dollars, or contract to pay *to* him three hundred thousand dollars for certain services; but it cannot, therefore, borrow four hundred thousand dollars, or contract to pay four hundred thousand dollars for those services. Then, though the Act in question is in the form of a contract, and though the company thus far have complied with the conditions on their part, does it not assume to create an unconstitutional liability?

Now the words " debt or liability," as used in the VIIIth Article, are general. A debt, as said before, may be absolute or contingent, express or implied, statutory or conventional, funded or unfunded. A debt exists where the State agrees to pay money in return for services or for money borrowed. It may exist though the principal is never to be paid. (3 Selden, 20; 1 Peters U. S. 216.) In a popular sense it includes all that is due to a party under any form of obligation or promise; (3 Metcalf, 526; 2 Blackstone's Commentaries, 464; Jacobs' Law Dictionary, " Debt;" 20 Cal. 324;) any kind of a just demand; (4 Seargent & Rawle, 506;) it may exist though there be no personal but only property liability; (*People ex rel. Mulford* v. *Mayhew*, 26 Cal. 665;) it may exist against the State, though it cannot be sued; (3 Selden, 93, 128;) in the meaning of this Article it is said to exist when a sum of money is due from the State by contract, express or implied. (20 Cal. 350.) Either of these definitions would embrace the liability created by the Act under consideration. The conditions fulfilled, the State agrees to pay absolutely fifty-two thousand five hundred dollars on January and July first of each year. And on the theory of the defendants, though the company should fail to perform its part of the contract hereafter, still this sum is due at stated times to the coupon holders, and the State must sue the company to recover back. There is, then, not only a contract to pay money for necessary expenses at a future day, on certain conditions, for services to be rendered or materials furnished, but there is an absolute agreement to pay money *in any event*, with an *immediate and a fixed liability* on the part of the State to pay it; and it is clearly, within even the argument of McCauley's counsel, in 15 Cal. 445, an inhibited liability. The sum is certain, the time is definite, the money is payable at all events. If the State was suable she would be liable to an action. In the words of section two, these " coupons for interest on said fifteen hundred bonds hereinbefore described shall be paid as they may fall due, from time to time, for said period of twenty years." Unlike warrants, which are merely a part of the

machinery adopted by the Government in the settlement of its accounts, and upon which no action can be maintained, (*People* v. *Gray*, 23 Cal. 125,) these coupons are evidences of indebtedness, binding obligations, negotiable instruments, floating from hand to hand, separated from the bond, and upon which the bearer may sue. (American Law Register for Aug. 1863, 595 ; *Jackson* v. *Y. & C. R. R. Co.*, Note ; *County of Beaver* v. *Armstrong*, 44 Penn. 63.) They are just as much liabilities against the State as are the bonds against the company. Warrants are payable out of "moneys not otherwise appropriated," and there is no obligation on the State to pay until there is money in the Treasury. In the State Prison case, "the appropriations were to take effect and the services to be rendered in future." "The State only became indebted as the services were each month performed," says Mr. Justice Field. But here the State is indebted, upon the issuance of these coupons, two million one hundred thousand dollars, and she promises to pay it in instalments, whether the eight cent tax yields enough or not, and service or no service on the company's part, say the respondents. The State is just as much indebted as would be an individual who had issued his promissory notes for that amount payable every six months for the next twenty years.

And even granting that the services rendered by section four are as much a part of the State's duty as to support her convicts, (which they are not,) the Legislature has no right to support convicts or pay Judges of the State by the issuance of bonds in this way.

Assume that the next Legislature should, in this same way, contract for building a Capitol, State Prison, etc., etc., and issue State obligations like these coupons to the amount of other millions of dollars. We are told it is not a State debt, because a tax is levied and an appropriation made—and tax of eight cents on the one hundred dollars for one purpose, five for another, ten for another, and so on. And respondents say these are *irrepealable*. If the Legislature can do this for twenty years, it can do it for all time ; thus one Legislature may farm out the whole public revenue to these different purposes, and

bind the people forever. For if a contract is thus created, a subsequent Legislature cannot repeal the law to affect the contract, nor can the people in Convention abolish their Constitution to affect it, as it is prohibited by the Constitution of the United States. (21 N. Y. 9 ; 22 N. Y. 9.) And yet we are told that a State debt is not created. Did not the national debt of England commence, and has it not grown in this very way ; farming out first one and then another source of the public revenue ? (*Newell* v. *People,* 3 Selden, 102, 115, 124 ; 13 Barb. S. C. 63, 188.)

The Act does not come within the exception of the Article which reads " except in case of war to repel invasion or suppress insurrection."

It is claimed that under this Article the Legislature is the exclusive judge when the contingency of war has arisen, and that by this law they have passed their judgment.

Is the Legislature the exclusive judge ? May it enact war in time of profound peace ? The actual existence of public war, and also of civil war, though never publicly proclaimed *eo nomine*, is a fact in our domestic history which this Court is bound to notice and to know. The Court does know judicially that the National Government is engaged in a civil war to suppress a gigantic insurrection against its authority. (2 Black, S. C., U. S., 667, Prize Cases.)

And does this Court not know judicially that upon April 4th last, or since, no war has existed in this State, no invasion to repel, no insurrection to suppress ? Is it in the power of the Legislature to assume a state of war when, confessedly, none exists ? This Article applies to a case of war wherein the *State* is engaged—to repel an invasion against *its* authority, to suppress an insurrection within *its* borders ; not to repel the invasion of an enemy into Virginia, not to suppress an insurrection in South Carolina.

But granting that the Legislature is the sole and exclusive judge of the existence of the exigency ; (*Martin* v. *Mott*, 12 Wheaton, 29 ; *Luther* v. *Borden*, 7 Howard, 44 ;) that it may incur an unlimited debt in case of existing war, and provide

for a probable or even a possible contingency of war at any time in future, the debt must be incurred to meet a *case of war*, and of *war only*. How is it with this Act? The debt is incurred for peace as well as for war purposes.

The preamble is no part of this statute. Where the words are clear, the preamble, like the title, is resorted to for no purpose. It is only to be looked at when the words are ambiguous. It cannot confer any powers *per se*. It can neither enlarge nor restrict the body of the Act. (*Edwards* v. *Pope*, 3 Scammon, 470; Dwarris on Statutes, *655; Sedg. Con. and Stat. Law, 55, etc.; 1 Story on Con., Secs. 459, 462.)

The history of this provision and of Article VIIIth is well known. They have been incorporated in most of the new, and the amendments to the old Constitutions of many of our sister States. They were intended to check that wild spirit of speculation that was bringing financial ruin on the country. They were, in part, intended to prevent our State from launching out into a system of internal improvements that had almost engulphed many of the older States in pecuniary embarrassments. Towns, cities, counties, and States, had felt the baneful effects of the universal rage for speculation. Everywhere in the Eastern States, examples of bankruptcy and repudiation could be seen; the legitimate result of loaning the public credit and contracting public debts to commence and carry on the construction of canals and railroads. States that had attempted to carry on these works in their own name, were forced to suspend, injuriously affecting State credit, depreciating all kinds of property, and bringing general stagnation in all departments of business. Other States sold out their public works, as a choice of evils, at an enormous sacrifice.

The State is prohibited from giving or loaning her credit, or directly or indirectly from becoming a stockholder in any corporation. Does she do either by the Act under consideration? We find little authority upon this question. A similar clause to that in our Constitution is incorporated in the Constitutions of Maine, New York, Pennsylvania, Maryland, Kentucky, Ohio, Indiana, Louisiana, Michigan, Iowa, Wisconsin, Minne-

sota, and West Virginia, but we find no direct decision in the Courts of those States upon the construction of this provision. It has been, doubtless, thought by their respective Legislatures that the terms of the section were so broad as to defy legislative evasion, and the clause has been accepted and acted upon in its natural and comprehensive signification.  ·

But it is argued that this Act is a contract, and that the State is but doing by this contract what she is constitutionally bound to do, viz: providing for transporting her convicts.

Again we answer, that if this section is violated in the creation of a contract, the Act is none the less unconstitutional, and the State must enter into contracts in such a manner as not to loan or give her credit.  And if it be a constitutional duty and a part of the legitimate functions of the Government to provide for carrying her lunatics, etc., that duty and function must be performed also in such a way as not to use the State credit.  And again we urge, that there is a great difference between a mere abstract constitutional obligation addressed to the Legislature and an absolute and specific loan or gift of the State credit.                                        ·

And so, too, it is said no credit is loaned, that appropriations are made to pay for services as rendered; and we again answer, ordinary appropriations are met by warrants payable only as money may come into the Treasury; but under this Act coupons are issued payable at all events at specified times—the one represents cash, the other credit.

Credit is defined to be " the selling of goods, ' or services,' or the transfer of property, in exchange for a written or implied promise of payment at a future time"—Worcester; to be "faith reposed, conferred, or bestowed; trust, confidence in, reliance on the honor or fidelity; reputed integrity or fidelity"—1 Richardson's Dic.; " the debt due in consequence of a contract, is also called a credit"—Bouvier's Law Dic.  (See, also Mills' " Principles of Political Economy," Vol. 2, Ch. 11; Colwell's " Ways and Means of Payment," 2d Ed. Ch. 7.)

Now it is the confidence, the trust reposed in the State's fidelity and ability to pay these coupons every six months dur- ·

ing the next twenty years, that makes them saleable. It is the credit of the State which this company is authorized to make use of to render its obligations more valuable. The credit of the State is represented by these coupons just as though she were to issue her bonds and put them upon the market to pay the debts of this company. The State is bound to redeem these coupons, to pay this interest, as the same falls due.

Suppose this company, at any time in the future, fails in the performance of the conditions imposed on it by the fourth section, the respondents claim that the State must still go on and pay these coupons; and under the last clause of that section must sue to recover back the moneys paid. Then, is not the State made a guarantor? She is pledged to pay what are really and virtually the debts of this company. The contract is broken by the company in June—she has no right to look to the State to pay these coupons in July; they are a debt of the company, but the company refuse to pay; the holders present their coupons on July 1st, at the Treasury, and claim payment, as the State has guaranteed their payment in any event, and it was a reliance upon that guaranty—a faith in the credit of the State—that influenced them to purchase these obligations. And can the State deny that she is a guarantor? She must pay the fifty-two thousand five hundred dollars on July 1st, though she sue on July 2d to recover it back; and so she must continue to pay these coupons every six months for the next twenty years, though, confessedly, the company shall not pretend to fulfil any of the statutory conditions on her part. The State has guaranteed the payment of the company's debt—the principal fails to meet its obligations—the guarantor pays. (*The People* v. *Denniston*, 23 N. Y. 251.)

And so here the company claim that in any event these coupons have a valid existence, and that the holders are legal creditors of the State, and if so, we claim that the credit of the State is virtually loaned, and should the State fail to recover back anything from the company, the State's credit is given away. And it may have been for the very object of

preventing such schemes as this that this clause was incorporated in the Constitution. Fearing lest the VIIIth Article might not fully accomplish their purpose, lest legal ingenuity might by some device attempt the creation of some kind of a contingent liability in substance though not in form, by the State guaranteeing the obligation of others, the framers inserted this section absolutely prohibiting a loan or gift of State credit in any manner. And if written Constitutions can be construed away and be evaded in the manner attempted by this Act, there is little use of them. It is worse than an open attack, for beside producing the same injurious results upon the State, such insidious and ingenious subterfuges are deadening to the moral sense of the Legislature and the people.

And, finally, we insist that this law is contrary to the spirit, intent, and policy of the Constitution; for, though it may be questioned, we think a Constitution may have a declared policy; (*Patterson* v. *Board of Supervisors, etc.*, 13 Cal. 182; *Chase* v. *Miller*, 41 Penn. 426); and that it is a policy of our Constitution, as gathered from Article VIII, and Article XI, tenth section, and other provisions, to keep the State free from debt, to keep it away from the schemes of internal improvement which have nearly wrecked sister States, to keep its people from being a tax-ridden and a debt-burdened people, to keep the Government within its legitimate sphere and to the performance of purely governmental functions.

Speaking of these clauses, Mr. Justice Baldwin says: "The intent is plain enough; they were designed as a check on legislation, and such legislation as might create a charge upon the property of the entire State." (13 Cal. 183.) They were intended to put it out of the power of the Legislature to burden the people with debt and taxation, as had been the case with other States; to protect them from the delusions, embarrassments, and onerous charges to which others or they in other States had been subjected. It was not merely the terms "debt" and "credit," not merely the shadow, but the substance, they were contending and providing against. It was not the particular form in which the liability might be incurred,

nor whether it took the shape of coupons or bonds, whether payable as interest or principal, in instalments or at one time, under one guise or another; it was designed to give every citizen a broad guaranty in the fundamental law that no debt was to be contracted beyond the prescribed limit in any way; that the State credit was not to be loaned or given in any manner which might either presently or ultimately involve taxation, and to secure them, until in their sovereign capacity they saw proper to revoke it, a sure and certain constitutional protection against the unwelcome visits of the tax gatherer, calling for money to pay such liabilities and to redeem the plighted faith of the State, that these provisions were written in the organic law. And as it has been said, if the Legislature may so easily evade these wholesome restrictions by such and similar laws as that under consideration, a debt to any amount may be contracted for a prohibited purpose, the credit of the State without limit may be pledged under its authority, and the consequent burdens imposed upon all the property and people of the State, subjecting them to the same oppressive taxation and exacting charges as though Article VIII and section ten of Article XI were stricken from the Constitution.

This is but the first evasion; it is attempted to be sustained under the guise of a contract purporting to be supported by a consideration which it is sheer nonsense to pretend is or was thought to be adequate, or that it was introduced by its author for any other purpose than to leap over or crawl under the barriers of the Constitution. This bill is but the entering wedge, and if permitted to be driven in by this Court, it will be followed by others that will eventually rive open the saving clauses of the Constitution. The public records of the State show that a sister scheme to this received its death at the veto of the Governor, while this was only wounded. Heal it, and it will be prolific of legislative progeny. These provisions will thus fail wholly to effectuate their manifest and substantial objects, and all their boasted protection be reduced to a mere myth.

It is, then, from the history of the times, and from the occa-

sion which brought about these limitations of power, from the plain intent as well as from the text, that we would read the Constitution to arrive at their true import; and in conclusion, we adopt the words of Mr. Justice Denio, *arguendo*, in *Newell* v. *The People*: "If the plausible language in which this Act is clothed is but a disguise too transparent to deceive the organs of legal vision—if, in substance and effect, distinct and clearly expressed constitutional provisions of great importance have been disregarded and set at naught, then this Court has no choice, no alternative, but to pronounce the measure null and void. Responsibility for consequences belongs to those who passed the bill. The Constitution was their commission, equally as it is yours, and if the same care and skill had been employed to discover the sense and follow the mandates of that instrument, which appear to have been exercised in order to evade it, no public interests would have been for a moment in jeopardy," and no unjust and illegal taxation levied upon the people of the State; and the people will learn that the limitations in the Constitution are a shield for their protection, and not a snare for their oppression.

*E. B. Crocker*, for Respondent.

*The Act provides for the issue of the bonds of the company, and not of the State, and the bonds in question are company, and not State bonds.*

The law merely provides for the payment of the *interest* of these bonds, by the officers at the State Treasury, from a special fund raised by a special tax for that purpose. Properly speaking, therefore, *no State debt is created* by the law, but provision is made merely for the payment of the interest *on a debt of the company.* There is a levy of a tax and an appropriation of money, but no creation of a State debt.

A case very similar in many points to the present, involving the same questions raised here, has already been passed upon by the Supreme Court of this State, and the validity of a contract entered into with the State, fully sustained in long and

able opinions. We refer to the cases of *The State* v. *McCauley*, 15 Cal. 454; *McCauley* v. *Brooks*, 16 Cal. 12.

In the first case, it was contended that the contract, which provided for monthly payments to be made as the services were rendered, created a State debt, and was therefore unconstitutional.

But the Court say : " The appropriations are to take effect, and the services are to be rendered in future. *Until the services are rendered, there can be no debt on the part of the State.*"

*But the Act is also within the exception of the Eighth Article.*

It was passed in a time of war, as a war measure. The preamble states fully the reasons of its passage. The Legislature state explicitly that the exigency had arisen which was provided for by the exception to Article VIII. They were the sole judges of the question whether this exigency had arisen or not, as was decided by the Court in *Franklin* v. *Board of Examiners*, 23 Cal. 174; *Luther* v. *Borden*, 7 How. U. S. R. 1; *Martin* v. *Mott*, 12 Wheaton, 19.

The Legislature having thus decided that the case had arisen which called for the exercise of the power to create a State debt, within the exception to Article VIII, they had the clear and undoubted right to add to the State debt if they saw proper. The restriction upon the power being removed, by the existence of war in fact, the Legislature was free to act as its judgment might dictate, being responsible only to the people.

But the fact that war existed, does not depend entirely upon the preamble to the Act. It is shown by the public history of the times, by various Acts of Congress, and the proclamations of the President, of all which this Court takes judicial notice. (*Franklin* v. *Board of Examiners*, 23 Cal. 176.)

We think the conclusion is clearly established, that the law in question does not violate the Eighth Article of the State Constitution.

It is further urged that the Act violates the following portion of section ten of Article II of the State Constitution, to wit : " *The credit of the State shall not in any manner be given*

26

*or loaned to or in aid of any individual, association, or corpora-tion.*"

The word "*credit*" is evidently here used as the opposite of *debt.* The passage means that no debt shall be created to make a gift or loan to or in aid of any individual, association, or corporation. If no *debt* is created, no *credit* is used. I have already shown that no debt is created, and therefore no *credit* is used. As was said by the Court, in *Patterson* v. *Super-visors of Yuba County*, 13 Cal. 183 : " The same argument which denies force to this proposition, that this is a State debt, equally refutes the idea that it is a loan of State credit."

As already shown, the Act is a *contract* between the State and the company. The provision for making the payments under the contract is merely an *appropriation* of money to be paid in future, out of the Treasury, like any other expenditure for purposes necessary for all Governments. It is an appro-priation of money for the payment of a liability arising under a contract, which accrues from time to time. No credit is given or used, but merely payments made.

It is evident that this clause does not mean that the Legis-lature may not *give* away or *loan* the money or property of the State. If it does, then a large portion of heretofore unques-tioned legislation is void. The numerous relief bills, dona-tions to charitable societies, and meritorious individuals, would all be void.

The Constitution leaves the Legislature free to use and dis-pose of the public money and property as they please, but they must not use the *credit* of the State, or incur a *debt* in so doing. Such bills merely appropriate the public money after it is received into the public Treasury, and therefore they are not void. So the law under consideration merely appropriates the public money after its receipt into the Treasury.

A law providing for raising money and appropriating the same to build a State Capitol, or any other law of like char-acter, would be equally liable to this objection as the present Act.

Under the Act, not only no *credit*, but no money is *given* or

*loaned* to the company. Money is paid to them for services rendered, under a valid contract.

The mere fact that the payments made under the contract afford incidental *aid* to a great work of internal improvement, renders it none the less a valid contract. Nor does it render it liable to any constitutional objection which does not lie equally against all contracts made by the State.

By the Court, SAWYER, J.

At the last session of the Legislature, an Act was passed, which was approved on the 14th of April, 1864, entitled, "An Act to aid the construction of the Central Pacific Railroad, and to secure the use of the same to this State for military and other purposes, and other matters relating thereto." (Laws 1864, p. 344.)

The preamble to said Act is as follows, viz:

" Whereas, War now exists and is in immediate and vigorous prosecution between the Government of the United States and certain States which have revolted against its authority; and, whereas, the Congress of the United States has, for military and other purposes, granted aid for the construction of the Central Pacific Railroad, which aid is insufficient to complete the work as speedily as is necessary; and whereas, it is important, in view of the present state of war and the further (future) danger thereof, that the said railroad be constructed as soon as possible to repel invasion, suppress insurrection, and defend the State against its enemies; therefore," etc.

Section one authorizes the corporation known as "The Central Pacific Railroad Company of California," to issue its bonds "in sums of one thousand dollars each, bearing interest at a rate not exceeding seven per cent per annum, commencing on the first day of July, 1864, and payable on the first day of January, 1865, and on the first days of July and January of each year thereafter; the interest on the first fifteen hundred of said bonds, numbering from one to fifteen hundred, inclusive, to be made payable at the State Treasury; * * * said

bonds to be executed and issued to an amount not exceeding twelve millions of dollars, payable not. exceeding twenty years from the first day of January, A. D. 1865, and said bonds to be secured by one or more mortgages on the railroad," etc.

Section two is as follows, viz :

" Sec. 2. To. expedite the construction of said railroad for the reasons set forth in the preamble to this Act, there shall be levied and collected in the year 1864, and annually thereafter, until the expiration of the time for the payment of said bonds, in the same manner as other State revenue is or may be collected, a tax of eight cents on each one hundred dollars of the taxable property in the State, in addition to other taxes, the same to be paid in the gold and silver coin of the United States, and the moneys to be derived from such tax shall be and is hereby appropriated and set aside to constitute a separate fund, to be known as the ' Pacific Railroad Fund,' out of which fund the coupons for interest on said fifteen hundred bonds hereinbefore described shall be paid as they may fall due and be presented for payment from time to time for said period of twenty years, and on payment thereof said coupons shall be taken up and cancelled by the State Treasurer ; and if at any time there should not be a sufficient sum of money in said fund to pay said interest when due, then an amount sufficient to make up such deficiency shall be taken from the General Fund for that purpose, or the State Treasurer shall make such other contracts and arrangements as may be necessary to make up such deficiency ; and whenever on the first day of July of any year there shall remain a surplus in said fund after the payment of the interest on said bonds as hereinbefore provided, such surplus shall be paid into the General Fund."

Section four provides, that : " The said grant to said company is made upon the express condition and consideration that said company shall and do at all times when required from and after the passage of this Act, transport and convey over their said railroad all public messengers, convicts going

to the State Prison, lunatics going to the State Insane Asylum, materials for the construction of the State Capitol building, articles intended for public exhibition at the fairs of the State Agricultural Society, and in case of war, invasion, or insurrection, as well as at all other times, also transport and convey over their said railroad all troops and munitions of war belonging to the State of California, free of charge, and without any other compensation than as herein provided, and shall also construct and equip, in running order, at a rate of not less than twenty consecutive miles of their said railroad each year hereafter, including that portion of said railroad now partially completed, until the same is fully completed and equipped." It also required the corporation to file with the Secretary of State an agreement under the seal of the corporation to perform all the conditions of the Act, and imposed other onerous conditions, among which was its consent to a repeal of a former Act providing for aid to said corporation, and a relinquishment of all rights accrued thereunder. It is further provided, that if the company fails to perform the conditions imposed on its part, "the said company shall be liable to repay to the State the amount which shall have been paid by the State under this Act."

Section five is as follows, viz : " Sec. 5. The several sums of money necessary for the payment required to be made under the provisions of this Act are hereby appropriated from the said funds and from the State Treasury for said several purposes, and the State Treasurer is hereby directed to pay the same as provided by this Act; and this Act, and the appropriations under the same, shall not be subject to the provisions of an Act entitled an Act to create a Board of Examiners, to define their powers and duties, and to impose certain duties upon the Controller and Treasurer, approved April 21, 1858."

The former Act referred to is repealed. These are the only provisions in any way creating any liability on the part of the State, or bearing upon the questions at issue in this action.

This suit was instituted in the name of the People of the

State of California on the relation of the Attorney-General, to restrain the "Central Pacific Railroad Company" from executing, or issuing under said Act, any of the said first fifteen hundred bonds with interest payable at the Treasury of the State not already issued, and, if any have been issued, to procure a cancellation thereof, and to restrain the State Treasurer from paying, and the said company from receiving, any of the interest payable on the first day of January next, upon the first coupons falling due, or any interest that may thereafter accrue, or from in any manner proceeding further under said Act, on the ground that said Act is repugnant to the Constitution of the State, and is, therefore, void. The injunction was denied, and defendants had judgment, from which plaintiffs have taken this appeal.

The provisions of the Constitution supposed to have been violated in the passage of the Act in question, are, Article VIII, which is as follows:

" The Legislature shall not in any manner create any debt or debts, liability or liabilities, which shall, singly or in the aggregate, with any previous debts or liabilities, exceed the sum of three hundred thousand dollars, except in case of war, to repel invasion, or suppress insurrection, unless the same shall be authorized by some law for some single object or work, to be distinctly specified therein, which law shall provide ways and means, exclusive of loans, for the payment of the interest of such debt or liability as it falls due, and also to pay and discharge the principal of such debt or liability within twenty years from the time of the contracting thereof, and shall be irrepealable until the principal and interest thereon shall be paid and discharged; but no such law shall take effect until, at a general election, it shall have been submitted to the people, and have received a majority of all the votes cast for and against it at such election; and all money raised by authority of such law, shall be applied only to the specific object therein stated, or to the payment of the debt thereby created; and such law. shall be published in at least one newspaper in each Judicial District, if one be published therein, throughout the State, for

three months next preceding the election at which it is submitted to the people."

And Article XI, section ten, which is in the following words, viz :

" The credit of the State shall not, in any manner, be given or loaned to or in aid of any individual, association, or corporation ; nor shall the State, directly or indirectly, become a stockholder in any association or corporation."

It is conceded in the record, that, at the time of the passage of the Act in question, the amount of indebtedness on the part of the State exceeded the limit of three hundred thousand dollars, and that the Act was not submitted to a vote of the people.

The questions to be determined, are :

Firstly—Does the appropriation made by the Act for the payment by the State semi-annually during the next twenty years of the interest on the first fifteen hundred bonds create a debt, or liability, within the meaning of these terms, as used in Article VIII of the Constitution.

Secondly—If so, does such debt or liability fall within the exception specified in said Article, of a debt created " in case of war, to repel invasion or suppress insurrection ?"

Thirdly—Does it constitute the giving, or loaning of the credit of the State in aid of an individual, association or corporation, within the meaning of the prohibitory clause of Article XI, section ten ?

The first question appears to us to have been determined in the negative by our predecessors in the cases of *The State of California* v. *McCauley*, 15 Cal. 455 ; *McCauley* v. *Brooks*, 16 Cal. 24, and *Koppikus* v. *State Capitol Commissioners*, 16 Cal. 249. In each of these cases, the construction of Article VIII of the Constitution upon the point now before the Court, was elaborately discussed by counsel, and determined by the Court. In the first case, the question arose upon a contract between the State and McCauley's assignor, entered into under the Act of March 21, 1856, whereby the State agreed to pay one Estell, lessee of the State Prison, the sum of ten thousand dol-

lars per month during a period of five years, for taking care
of the State prisoners, the Controller to draw his warrant
monthly for said amount, which warrant was to be paid on the
last day of each month, " out of money in the Treasury not
otherwise appropriated." Mr. Chief Justice Field in deliver-
ing the opinion of the Court, said : " The Eighth Article was
intended to prevent the State from running into debt and to
keep her expenditures, except in certain cases, within her
revenues. These revenues may be appropriated in anticipa-
tion of their receipt, as effectually as when actually in the
Treasury. The appropriation of the moneys when received
meets the services as they are rendered, thus discharging the
liabilities as they arise, or rather anticipating and preventing
their existence. This appropriation accompanying the ser-
vices operates, in fact, in the nature of a cash payment." (15
Cal. 455.) In *McCauley* v. *Brooks*, the question arose upon
the same contract, and the Court say : " It is not essential to
its validity (the validity of an appropriation), that funds to
meet the same should be at the time in the Treasury. As a
matter of fact, there has seldom been in the Treasury the
necessary funds to meet the several appropriation Acts of each
year. The appropriation is made in anticipation of the receipt
of the yearly revenue." (16 Cal. 28.)

The question in *Koppikus* v. *State Capitol Commissioners*
arose upon a contract for erecting a State Capitol, made in pur-
suance of the Act of March 29, 1860. The Act authorized the
Commissioners to contract to the extent of one hundred thou-
sand dollars. It provides, that, " the sum of one hundred
thousand dollars is hereby appropriated out of any money in
the Treasury, not otherwise appropriated, to carry this Act into
effect." (Laws 1860, 131, Sec. 12.) This Act was held not
to be repugnant to the Eighth Article of the Constitution,
upon the same grounds as stated in *The State* v. *McCauley.*
The Court citing that case say : " For the liabilities which
may be thus incurred the Act makes provision; it appropri-
ates, for that purpose, the requisite sum, thus anticipating their
existence, and discharging them as they arise." (16 Cal. 253.)

The principle of these cases may be further illustrated. The power of taxation is vested in the Legislature, and that power is unlimited. Says Mr. Chief Justice Field, in *McCauley* v. *Brooks:* "We admit that the Legislature possesses the entire control and management of the financial affairs of the State; that it may levy such taxes as it may deem expedient, subject only to the constitutional requirements of equality and uniformity, and devote the proceeds of the taxation to such specific objects as it may think proper." (16 Cal. 34.) And, again (Ib. p. 56): "So it (the Legislature) has the power to impose a tax amounting to the entire value of the property upon which it is levied; but the possession of the power does not justify the supposition that it will be arbitrarily and tyrannically exercised."

The Legislature may not only determine the extent to which it will exercise the taxing power, but also for what objects of public interest it shall be exercised, and it may appropriate the moneys raised to such objects. The Court of Appeals of New York, in the *Town of Guilford* v. *Supervisors of Chenango County*, say: "The Legislature is not confined in its appropriation of the public moneys, or of the sums to be raised by taxation in favor of individuals, to cases in which a legal demand exists against the State. It can thus recognize claims founded in equity and justice in the largest sense of these terms, or in gratitude, or charity. Independently of express constitutional restrictions, it can make appropriations of money whenever the public well-being requires or will be promoted by it; and it is the judge of what is for the public good." (13 N. Y. 149; see also *Contra Costa County* v. *Board of Supervisors of Alameda County*, 26 Cal. 641; and *Blanding* v. *Burr*, 13 Cal. 347.)

There is in the Constitution of California no limitation on the power of the Legislature to appropriate moneys, either as to the amounts to be appropriated, or the objects for which they may be made, and only one limitation as to the time over which the appropriations may extend. Section twelve, of Article I, provides, that "no standing army shall be kept up by this

27

State in time of peace; and in time of war no appropriation for a standing army shall be for a longer time than two years." This is the only limitation upon appropriations, either as to the object, amount, or time over which it may extend.

The Constitutions of some States—as New York and Ohio—have a provision like the Eighth Article in ours, and a further restrictive provision limiting all prospective appropriations to two years. Under this latter restriction, and the consequent want of power in the Legislature to raise the revenue, and make the necessary appropriations to meet the payments accruing after two years, a contract to repair the canals in Ohio for a period of five years, was held by the Supreme Court of that State to create a debt. And the debt thus created, exceeding the constitutional limit, the law authorizing the contract was declared unconstitutional. (*State* v. *Medbery*, 7 Ohio St. R. 526.) The effect of this additional restriction upon the question now under discussion, and the distinction between those contracts which *do*, and those which *do not*, *create a debt* within the meaning of the constitutional restriction, are so clearly and forcibly stated by the Court in discussing the question in *The State* v. *Medbery*, that we do not hesitate to quote largely from the very able opinion delivered by Mr. Justice Swan in that case.

The Board of Public Works undertook to bind the State by present obligation upon contracts for repairs of canals, etc., to pay plaintiffs and others, in instalments running through five years, the gross sum of one million three hundred and seventy-five thousand dollars. Article VIII of the Constitution of Ohio is substantially the same as the same Article in ours, except that the amount to which the debt is limited is seven hundred and fifty thousand dollars instead of three hundred thousand dollars. Article II, section twenty-two, of the Constitution of Ohio provides, that "No money shall be drawn from the Treasury except in pursuance of a specific appropriation made by law, and no appropriation shall be made for a longer period than two years." The question was whether these contracts created a debt within the meaning of the con-

stitutional prohibition.   The Court say (7 Ohio St. R. 528) :
" Before proceeding to state the scope and operation of these
provisions of the Constitution, it may be proper to allude to
the general working of the financial system of the State in
respect of the payment of current expenses and the creation
of a debt.

" The sole power of making appropriations of the public
revenue is vested in the General Assembly.   It is the setting
apart and appropriating by law a specific amount of the rev-
enue for the payment of liabilities which may accrue or have
accrued.   No claim against the State can be paid, no matter
how just or how long it may have remained over due, unless
there has been a specific appropriation made by law to meet it.
(Article II, Section 22.)

" By virtue of this power of appropriation, the General
Assembly exercise their discretion in determining, not only
what claims against or debts of the State shall be paid, but
the amount of expenses which may be incurred.   If they
authorize expenses or debts to be incurred, without an appro-
priation to pay them, and the expenses are incurred, those
expenses create a debt against the State, and it must remain
such, until payment under an appropriation afterward made.

" The General Assembly usually, however, provide for the
current expenses for a period not exceeding two years, out of
the incoming revenues, by making appropriations of a suffi-
cient amount of money to pay the expenses during that
period, and provide by law for the raising of revenue sufficient
to meet the appropriations.

" The discretion of each General Assembly for the period of
two years in respect to the amount of expenditures, except in
some special cases relating to salaries, is without limit, and
without control ; but each must provide revenue and set apart
a sufficient amount, by law operative within the same two
years, to pay all expenses and claims.

" This is the general system  provided  by the Constitution ;
(Article II, Sec. 22 ; Article XII, Sec. 4.)   Under it, all the
claims which are authorized, or which can accrue within each

of the two years, and their payment, form one governmental and financial transaction; so that, at the end of each of the two fiscal years, the expenditures authorized and liabilities incurred have been provided for by revenues previously set apart and appropriated are paid.

" So long as this financial system is carried out in accordance with the requirements of the Constitution, unless there is a failure or deficit of revenue, or the General Assembly have failed from some cause to provide revenue sufficient to meet the claims against the State, they do not and cannot accumulate into a debt. Under this system of prompt payment of expenses and claims as they accrue, there is undoubtedly, after the accruing of the claim, and before its actual presentation and payment, a period of time intervening in which the claim exists unpaid; but to hold that for this reason a debt is created would be the misapplication of the term debt, and substituting for the fiscal period a point of time between the accruing of a claim and its payment, for the purpose of finding a debt; but appropriations having been previously made and revenue provided for payment as prescribed by the Constitution, such debts, if they may be so called, are, in fact, in respect of the fiscal year, provided for, with a view to immediate adjustment and payment. Such financial transactions are not, therefore, to be deemed debts.

" But if the General Assembly should authorize liabilities to be incurred and make no appropriations to meet them, but let each citizen who performed service or furnished materials to carry on the Government, hold his claim against the State unpaid, debts to the amount of these claims against the State would at once be created, and remain debts at the end of two years and until an appropriation was made to meet them, whatever public revenue might be on hand, inasmuch as every executive officer is forbidden by the Constitution to pay any claim unless there has been a specific appropriation for that purpose made by law.

" And for the same reason, if, without appropriations or revenue provided, the General Assembly should authorize con-

tracts binding the State to pay specific sums of money to citizens within two years contingent upon their furnishing certain materials or labor, these contracts would at once create a contingent debt, and on performance would become an absolute debt. On the other hand, if appropriations were made, but the claims authorized to be paid could not be and were not paid, on account of there being no funds, such claims would also become debts.

" The general system in its practical workings has been described for the purpose of eliminating two or three propositions, which, however simple and obvious, cannot be lost sight of without rendering unintelligible the discussion of the questions before us. They are these :

" 1. Providing revenue sufficient to meet either prospective or accruing debts authorized to be incurred, or to meet even debts over due, still leaves them unpaid, and they must remain debts contingent or absolute until a law is passed appropriating the public revenue to meet them and until they are afterward paid.

" 2. *If, however, the constitutional provisions are complied with, and both revenue is provided and appropriations are made to meet expenses or claims, prospective or accruing, for the period of two years, such accruing liabilities, contingent or absolute, are not deemed debts, public funds having been provided and set apart by appropriations for their immediate payment.*

" It will be seen at once, when these propositions are applied to the contracts before us, that this financial system and the contracts are wholly inconsistent with each other. While each General Assembly is required to provide revenue and make appropriations for the period of two years, leaving no debt or liability behind, the General Assembly existing when these contracts were made, and who it must be maintained had the constitutional power by law to authorize them, have undertaken by contracts in behalf of the State to bind the State by present obligation to pay specific amounts of money to certain citizens for services and materials, to be furnished as well during the above mentioned two years as also during

the period of three years thereafter. It is the three years thereafter—the liability created against the State the moment these contracts were signed for the specific sums promised for the repairs of those three years—the volunteering on the part of that General Assembly to provide for the repairs of the canals *during those three years without the power of making appropriations to meet the liability thus authorized and entered into—it is these peculiar characteristics of the contracts which render them inconsistent with the system of finance and expenditure provided by the Constitution.* But we shall have occasion to recur to this subject again.

" The question before us is, whether a contract binding the State to pay specific sums of money at a future period, *without revenue provided or appropriations made to meet it,* is such a contingent liability as may be entered into under this financial system and the provisions of the Constitution relating to debt.

" I. And first as to these contracts coming within the inhibitions of the Constitution relating to debts. This question necessarily leads us to inquire as to the scope and operation of the Constitution relating to debts; what debts are inhibited; whether contingent debts are included in the inhibition; and whether these contracts create contingent debts.

" If the Constitution had contained simply the provision that ' no debt whatever shall hereafter be created by or on behalf of the State,' without any exception or reservation upon these sweeping terms, then, as we have already stated, no liability could have been created for money, material or services, no contract entered into, binding the State, without revenue actually raised, and appropriations therefrom made, to meet the liability during the fiscal year. And inasmuch as, by another provision of the Constitution, no appropriations can be made for a period beyond two years (Art. II, Sec. 22); it follows that if no debt whatever could be created, and no appropriation made beyond two years, then a present obligation and liability to pay at a period beyond two years could not be made, *because it could not be made on a footing of liabil-*

*ities which are provided for by appropriations, and would, there-fore, be inhibited.*"

Again, in answer to an argument that an absolute constitutional obligation rested upon the General Assembly to provide for the repairs of the canals, the Court further say, upon this point (page 538) : " This line of argument assumes in the first place, that there is a constitutional obligation resting on the General Assembly to provide for the inherent and ordinary operations of the Government, and among others the repair of the canals; but the argument is silent both as to the period of time and the manner in which the Constitution requires each General Assembly to provide for these operations and pay for them. Instead of this obligation being an indefinite and theoretical duty as stated by counsel, it is practical and specific in manner and time, and is devolved, not on the General Assembly as a perpetual body, but upon each General Assembly, convening biennially and for the period of two years and no longer. *They must do it, too, by appropriations made and revenue provided, and consequently without creating any debt whatever.* And here their duty ends. The constitutional obligation passes over to their successors.

" If the General Assembly, existing when these contracts were made, and who are supposed to have authorized them, had undertaken by appropriations beyond two years (and that is the only mode in which they could authorize expenditures without creating debt, absolute or contingent), to provide for the repair of the canals, their law would have been unconstitutional and void. If this be not deemed an answer to the foundation of this whole line of argument, then we say further, that as to the fact that repairs beyond two years would probably be needed, and expenditure therefore required, and for an amount probably equal to that designated in these contracts, and then paid, we answer, that, whether the repairs would or would not be needed, and the amount of the expenditure and their payment were questions to be determined by the successors of the General Assembly who are supposed to have authorized these contracts to be made; and that General

Assembly have, by their contracts, not only determined that the expenditure should be made, and fixed the amount beyond the control of their successors, but have also, in so doing, created a present liability against the State to pay specific sums of money *at such a period that they could not, by appropriations, provide for payment.* Their authority to provide, without the revenue or appropriations, for the repair of the canals beyond two years, by contracts creating a present obligation, clearly cannot be justified or constructively authorized from their duty to provide revenue and make appropriations for repairs for the period of two years only. *The first creates a contingent debt upon a subject matter beyond their sphere of duty, and relating to expenditures required by the Constitution to be provided for by their successors; the last creates no debt of any kind.*

"These contracts, then, so far as the inhibition of the Constitution relating to debts is involved, stand precisely upon the same ground as any other contracts for expenditure which the General Assembly have authorized, but provided no revenue and made no appropriations to meet the amount specified to be paid by the State when it becomes due. It is a contingent debt ripening into an absolute one, without money being set apart to meet and pay it. The contracts, indeed, can stand nowhere else than among inhibited debts, inasmuch as they are, in our opinion, and for the reasons which we shall now state, in addition to those already given, inconsistent with the provisions of the Constitution relating to expenditures and appropriations."

And again, page five hundred and forty: "Each General Assembly determines the amount of revenue to be raised by taxation, and are required by the Constitution to provide for raising sufficient to meet the expenditures which they authorize, and thus become officially responsible for the amount of the appropriations. And in order to make this responsibility direct and practical, and to rest upon each General Assembly during its term, the Constitution *prohibits any appropriation to be made for a period beyond two years.*

"*This last provision is the keystone of the whole system;* for, as the amount of taxes depends entirely upon the amount of the appropriations, if the General Assembly had no power or discretion to determine the amount of appropriations, or if the amount were fixed by a law of their predecessors, so that they could not disturb it, they would evade all responsibility for the amount of the taxes, however oppressive and grievous they might be.

" It results from these constitutional provisions :

" First—The General Assembly at each biennial session determine the amount of the expenditure for the two years of their official term, in all cases not otherwise predetermined by the provisions of the Constitution. Second—They must take the responsibility of making the necessary appropriations for this purpose, otherwise no money can be paid. Third—They must assess a tax upon their constituency sufficient in amount to meet the appropriations. \* \* \* But all these restraints upon the members of the General Assembly and their official responsibility for the amount of appropriations and taxes to be assessed, so wisely provided by the Constitution, are set aside and annulled by the contracts under consideration. Instead of being entered into for two years, and appropriations made and revenue provided therefor, the contracts are made for five years; and, after the expiration of two of the five years, the contracts determine, and not the succeeding General Assembly, what amount of appropriations shall be made, and consequently what amount of revenue shall be provided for the repair of the canals. (Ib. 541.) \* \* \* We are of the opinion that the discretion, power and responsibility of the General Assembly conferred by the Constitution were not intended to be, and therefore cannot be thus superseded; that no law could be passed under which an agreement between the Board of Public Works and two or more citizens could for any period beyond two years divest the General Assembly of its discretion and control over the appropriations, or the amount of the appropriations to be made for repairs to the public works of the State." (Ib. 542.)

28

The principles thus stated and illustrated are these : That the legislative department of the Government is vested with the power of taxation, and the authority to determine the objects for which the taxing power shall be exercised, and to appropriate the moneys thus raised to such objects; but that the power of appropriation under the Constitution of Ohio is limited to two years—that, when an appropriation is made for an object to be accomplished, and paid for within the .two years, and at the same time, revenue is provided to meet the appropriation, a contract made in pursuance of the appropriation, and payable out of it, does not create a debt within the meaning of the prohibitory clause of the Constitution.   The whole is regarded as a single financial transaction.   The revenue is provided and set apart for the specific object, and is in contemplation of law in the Treasury.   In fact, only the ministerial duty remains of collecting the revenue, and paying it over in pursuance of the appropriation, and the acts done are regarded as cash transactions.   But a contract to be performed beyond the two years, or without raising and appropriating the revenue to meet it, necessarily creates a debt, as the services cannot be paid for when rendered in the first case, because the legislative power has no authority to make the appropriation, and in the second, because it has failed to do it. The theory is, that if the Legislature provides a million of dollars revenue, by taxation or otherwise, for any given year, or other period of time within the constitutional limit, and .appropriates a million of dollars to be paid out of it, the one .balances the other, and the debt or liability of the State is not increased thereby.   True, a portion of the money provided may be stolen, or destroyed, or by reason of some unlooked for accident may not be collected or on hand when needed, and in such case a debt or liability might ultimately accrue from this cause to the extent of the deficit thus accidentally arising.   But no debt can result till the contingency arises, and the validity of the debt can only be affected to the extent of such accidental deficit.

In our Constitution, as we have seen, there is no restriction

upon the power of taxation, or upon the objects, or the time for which appropriations may be made, except, that "no appropriation for a standing army shall be for a longer time than two years." As to all other objects, so far as any constitutional restriction is concerned, it may as well be for twenty as for two years. This may have been an unwise omission, and yet it does not seem to have been an oversight, for the attention of the framers of that instrument was directed to the subject, when the two years limitation was imposed upon " appropriations for a standing army."

The Act under consideration provides, that "there shall be levied and collected in the year 1864, and annually thereafter until the expiration of the time for the payment of said bonds, in the same manner as other State revenue is or may be collected, a tax of eight cents on each one hundred dollars of the taxable property in the State, in addition to other taxes, the same to be collected in the gold and silver coin of the United States, and the moneys to be derived from such tax shall be and is hereby appropriated and set aside to constitute a separate fund, to be known as the ' Pacific Railroad Fund,' out of which the coupons of interest on said fifteen hundred bonds hereinafter described shall be paid as they may fall due and be presented from time to time for said period of twenty years." (Section 2.) And in section five: " The several sums of money necessary for the payment required to be made under the provisions of this Act are hereby appropriated from the said funds and from the State Treasury for said several purposes, and the State Treasurer is hereby directed to pay the same as provided by this Act." Here is a provision for raising a fund, and setting apart and appropriating it to the payment of the interest on the bonds in question, more specific than those in the cases of *The State* v. *McCauley, McCauley* v. *Brooks*, and *Koppikus* v. *State Capitol Commissioners*, because in those cases the payment was to be made, generally, out of "moneys in the Treasury not otherwise appropriated," without providing any specific fund and devoting it to that use alone, or knowing whether or not there would in fact be any unappropriated moneys in

the Treasury at the time payments would fall due. In this case a specific fund is provided and set apart, to be devoted to the payment of the interest in question alone; and it would seem to be more than ample for the purpose, as the tax provided for on a sum much less than the present assessed valuation of the taxable property in the State, would produce the required amount, and the appropriation from the General Fund will not be required till the specific fund is exhausted, which may, and in all probability, never will occur. For these reasons there would be even less propriety in holding this appropriation to be a debt or liability, within the meaning of the constitutional restriction, than those which were the subjects of discussion in the cases cited. The Legislature has provided a fund, and made the appropriation for the entire amount. No further legislation is required upon the subject. Nothing further remains to be done on the part of the State, but the ministerial duty of collecting the taxes and paying the interest out of the proceeds, as it from year to year accrues. Of course the State cannot, without a breach of good faith, refuse through its officers to perform this ministerial duty.

The same reasons that are urged to show that the Act under consideration creates a debt or liability within the meaning of these terms as used in the Constitution, apply with equal force to all of the appropriations made in this State for defraying the general expenses of the State Government; and upon the construction contended for, it would be impossible to carry on the Government without violating the Constitution, or levying and collecting the revenues of the State, under the present Constitution, two years in advance of the time when they would be required for actual disbursement. It is utterly improbable that such should have been the intent of the men who framed, or the people who adopted the Constitution.

But if the reasons for maintaining the decisions already cited upon this question were less cogent than they are, we should now hesitate long before overruling them. The last of them was rendered in 1860. The construction put upon the clause under consideration thenceforth became a judicially recognized

part of the Constitution. Since that time two Legislatures have proposed, and the people have adopted, numerous amendments to other sections of the Constitution, but this provision was left unchanged. It must be presumed, therefore, that they were satisfied to have the provision under consideration stand with the interpretation thus put upon it by the Courts.

It follows, from these views, that the Act under consideration does not create, or authorize to be created, a debt, or liability, within the meaning of the limiting clause of the Eighth Article of the Constitution.

Secondly—Conceding a debt or liability to have resulted from the action of the Legislature, is it a debt created " in case of war, to repel invasion, or suppress insurrection ?"

Whether or not the contingency has arisen, which authorizes the Legislature to exercise the power vested in it, within the meaning of this exception, and whether it will exercise the power, are questions for that body to determine. The duty and responsibility of providing ways and means to carry on a war in which the State may be engaged, or for repelling, or aiding to repel invasion, or suppressing or aiding to suppress insurrection, rest upon the political departments of the Government, and not upon this Court; and the correlative right to determine when the emergency has arisen requiring their action, must, necessarily, to be effective, reside in those bodies upon which this great public duty, and weighty responsibility are imposed. If this power is exercised improvidently or unwisely, the individual members of those departments are responsible therefor to their constituents. But when the political departments of the Government have determined that the emergency has arisen, and acted upon that determination, that action is conclusive, and not subject to be reviewed by this Court.

That the State of California, as an integral part of the United States, is actually engaged in war, and in suppressing a vast and powerful insurrection, the general history of the country, and the legislation, both of the State and National Governments, as well as their judicial records, furnish ample evidence.

Nor can it be assumed, that, in the war actually existing, there is no active element of insurrection, and no immediate danger of conflict within our own borders and upon our own soil. The National Government has, at least, thought it necessary to make extraordinary preparations for our defense. It has during the last four years expended and is now expending, large sums of money in the erection of fortifications for the protection of our harbors, and in building an iron-clad vessel for our immediate use. Our principal city also, lest the completion of the ironclad Monitor furnished by the General Government should be too tardy, has assumed large responsibilities in order to hasten the work. So also successive Legislatures have, in various ways, appropriated and expended hundreds of thousands of dollars for organizing and drilling our militia, and holding camps of instruction to prepare our citizens for prompt and effective service, should the insurrection more decidedly manifest itself within our own borders.

It cannot be disguised, that, in spite of a determination on the part of the General Government to deal justly with all nations, and of the exercise of the most consummate skill of diplomacy to avert such a result, the existing rebellion is liable at any moment to draw after it a foreign war, and an invasion of our State from abroad. War has, in fact, been actually levied within our borders, as in the case of the Chapman, and active hostility may at any moment manifest itself anew. These facts constitute a portion of the general domestic history of the country, as well as of its legislative and judicial history, and as such may be noticed. (Prize cases, 2 Black, U. S. Sup. Court R. 667.) They furnish, at least, a basis for the political departments of the Government to consider, whether or not the contingency contemplated by the exception in the Constitution has arisen; and if those departments have considered and determined the question, that determination is conclusive. This point was also so decided by our predecessors—all the Justices concurring—in the case of *Franklin* v. *The Board of Examiners*, 23 Cal. 175, in which the same question arose under the Act of April 27, 1863, (Laws of 1863, p. 662,)

appropriating six hundred thousand dollars "for the relief of the enlisted men of the California Volunteers in the service of the United States." The Court say : " The evident intention was to impose limitations upon the general power of the Legislature to create debts, leaving them free, however, from such restrictions in great emergencies caused by a war, an invasion or an insurrection. In such cases the Legislature should be left free to exercise their judgment and discretion upon the subject, answerable alone to the people for any abuse of the power. The existence of the emergency calling for the exercise of the power is purely a political question, and the Legislature, as the body in whom the political power of the State is vested, are the sole judges as to the existence of such emergency. It is the exercise of a purely political power, upon a political subject, in no manner of a judicial character, and it is not, therefore, subject to review or liable to be controlled by the judicial department of the State Government." To the same effect are the cases of *Martin* v. *Mott*, 12 Wheat. 29 ; *Luther* v. *Borden*, 7 How. U. S. S. C. 44 ; *Vanderheyden* v. *Young*, 11 John. 157.

　　Railroads are, undoubtedly, among the most effective agencies employed in modern warfare. In the existing war hundreds of miles of railroads have been destroyed, at a great expenditure of life and treasure, expressly to deprive the adversary of the destroying army of their use ; and many other miles have been constructed, at Government expense, expressly to facilitate the operations of its armies. A railroad from the navigable waters of the State to the granite quarries and forests of the Sierra Nevada mountains, might be of great importance to furnish timber and granite for fortifications, and timber for vessels of war, in case our only port of San Francisco should be blockaded, and cut off from all attainable external sources of supply ; and it might be of great service for other uses to which such works are applied in military operations. Such a road the " Central Pacific Railroad" is designed to be. The National Government thought its construction a matter of sufficient importance in a military point of view to

justify large grants of land, and grants of the use of the national credit to a large amount to aid in its construction. Whether or not, in view of such facts, this railroad is of sufficient importance to the military operations of the State of California in the emergency present and prospective, and as such a proper subject for legislative appropriations with a view to hastening its completion, and rendering it available to the State at an early day, are also questions committed to the sound discretion of the political departments of the State Government. These departments being charged with the duty of providing for the safety of the State, are authorized to select such means of defense and protection as they may deem most appropriate. Mr. Chief Justice Marshall, in *McCullough* v. *State of Maryland*, 4 Wheat. 421, says: " We think the sound construction of the Constitution must allow the National Legislature that discretion with respect to the means by which the powers it confers are carried into execution, which will enable that body to perform the high duties assigned to it in the manner most beneficial to the people. Let the end be legitimate, let it be within the scope of the Constitution, and all means which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the Constitution are constitutional." (See also *Lick* v. *Faulkner*, 25 Cal. 405.) Such being the case, the determination of these questions by the political departments of the Government must, also, necessarily be conclusive.

The only remaining inquiry under this head, is, whether those departments have determined that the exigency has arisen requiring their action, and, that the work is of sufficient importance to the State for military purposes to justify an appropriation of the public moneys to aid and hasten its early completion? And to this inquiry, the Act itself under consideration furnishes a conclusive answer in the affirmative.

The preamble recites the existence and vigorous prosecution of the war between the Government of the United States, and certain States which have revolted against its authority; the grant by Congress of aid for the construction of the Central Pacific Railroad for military and other purposes; the insuf-

ficiency of such aid to complete the work as speedily as necessary ; and the importance " in view of the present state of war and the further [future] danger thereof, that the said railroad be constructed as soon as possible to repel invasion, suppress insurrection and defend the State against its enemies," and then enacts in section two, that " to expedite the construction of said railroad, *for the reasons set forth in the preamble to this Act*, there shall be levied and collected," etc.  Thus the contingency contemplated in the Constitution is recited in the preamble, which is referred to in the body of the Act for the reasons that operated upon the Legislature to induce that body to pass the law and make the appropriation.

Thirdly—Does the Act in question give or loan the credit of the State to an individual, association or corporation, within the meaning of the prohibition contained in Sec. 10, Art. XI, of the Constitution ?

" In case of war, to repel invasion or suppress insurrection," as we have seen, the Legislature may appropriate the funds, or employ the credit of the State without limit.  The two provisions must be so construed, if possible, that they may stand together, and so that there shall be no restriction upon the general power of the political departments of the Government to render all the resources of the State available in time of war.  If the Legislature may authorize the building of a railroad for military purposes, it may certainly appropriate funds to aid a corporation in the construction of a similar work in consideration of its use for such purposes.  The principal end being the advantage to be derived from the use of the road, it matters not that the appropriation incidentally aids an individual, association or corporation.  And as before shown, the question, as to whether the emergency requiring an appropriation for such purposes has arisen, is one for the political departments of the Government to determine.

But in our view there is no loan or gift of the credit of the State in any just sense of these terms.  A railroad extending from the navigable waters of the State to its eastern boundary on the summit of the Sierra Nevada, and designed ultimately

29

to unite with another road connecting it with the Atlantic seaboard, was, at the time of the passage of the Act in question, in process of construction, and actually completed and in operation for a very considerable portion of the distance.   In the judgment of the Legislature, the State had, or was liable to have, immediate use for this railroad for military purposes, and upon certain onerous considerations, among which, were, that the company constructing said railroad should proceed and complete it at a certain rate per annum, and should, at "all times when required from and after the passage of this Act, transport and convey over the said railroad, all public messengers, convicts going to the State Prison, lunatics going to the Insane Asylum, material for the construction of the State Capitol, articles intended for public exhibition at the fairs of the State Agricultural Society, and in case of war, invasion or insurrection, as well as at all other times, also transport over their said railroad all troops and munitions of war belonging to the State of California free of charge, and without any other compensation," than as in said Act provided, made the appropriation under consideration.   It is, then, simply a case of the State paying a corporation for valuable services to be rendered, commencing at the present moment and extending through all future time.   It is not a matter of the slightest consequence to the State whether the payment is made directly to the company or to the creditors of the company, except by securing it to the creditors of the company, who furnish in part, the funds to carry on the work, the money for that purpose is more likely to be readily obtained; and in this respect, an advantage accrues to the State in obtaining a greater security for the performance of the contract on the part of the company.   The State purchases certain advantages of the company, and pays the price to certain designated creditors of the company in satisfaction of interest accruing from time to time on its bonds, instead of paying it directly to the company.

Besides, as we held in the discussion of the first point, no debt on the part of the State is created, and consequently no

credit in any proper sense of the term arises. The act of the State in assuming to make these payments, consists in a single provision made in advance, raising a fund, setting it aside and specifically appropriating it to the payment of the interest semi-annually, from year to year, upon the presentation of the coupons at the State Treasury—these coupons serving as warrants upon which the money is to be drawn from the Treasury. As no debt or liability in the constitutional sense is created, so no credit in the constitutional sense arises, or is loaned or given. A fund is provided in advance for the purpose, and out of it the services to be rendered by the company to the State are to be paid, but the payments are to be made on behalf of the company, in satisfaction of interest due from it to certain designated creditors. The money being provided in the first instance, and being in contemplation of law, always on hand in the Treasury, before the instalments of interest accrue, the transaction on the part of the State upon the principles before stated, is regarded as a cash transaction. From these views, it follows, that, the Act in question is not repugnant to section ten of Article XI of the Constitution.

Our conclusion is that the Act in question is constitutional.

The judgment, so far as it denies the relief asked for in the complaint, must, therefore, be affirmed.

But the judgment goes beyond this and affords affirmative relief in favor of the "Central Pacific Railroad Company," one of the defendants, against Pacheco, another defendant, and his successors in office. There is nothing in the record to sustain this part of the judgment, and to this extent it is erroneous and ought to be corrected. True, Pacheco has not appealed, but the People, and not Pacheco, are the real parties in interest. That part of the judgment may be of no practical consequence, but it is, nevertheless, not sustained by the record, and for this reason ought not to stand.

It is ordered that the District Court modify its judgment by striking out all that portion of the said judgment subsequent to the denial of the injunction, and of the relief sought in the

complaint, and that the judgment as thus modified stand as the judgment of the Court.

Mr. Justice RHODES, concurring specially.

I concur in the judgment on the sole ground that, by virtue of the Act of the Legislature mentioned in the opinion of Mr. Justice Sawyer, and the issuing of the first fifteen hundred bonds with coupons attached, by the railroad company, payable by the State, a *debt* against the State was created, which was none the less a debt, and did not cease to be a debt, because provision was made in the Act for its payment—that is, because a tax was levied and an appropriation was made for that purpose; and that the existence of war removed the constitutional restriction against the creation of a debt exceeding three hundred thousand dollars.